**IIN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **EDDIE ROBINSON,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**DENNIS LARSON, M.D., and JENNIFER BASLER, LPN,**<br><br>**Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Case No. 24-cv-00584-DWD** |

**MEMORANDUM & ORDER**

**DUGAN, District Judge:**

This case concerns the medical care Eddie Robinson received for ulcers on his left foot while incarcerated at Big Muddy River Correctional Center (BMRCC). Surgeons ultimately amputated his left second and third toes. Robinson alleges that the footwear prescribed to him, the treatment of his wounds before the amputations, and his care after surgery reflected deliberate indifference to his serious medical needs in violation of the Eighth Amendment. Defendants Dennis Larson, M.D., and Jennifer Basler, LPN, move for summary judgment. (Docs. 73, 74). Plaintiff Eddie Robinson responded with supporting exhibits (Docs. 83 through 83-14), and Defendants replied (Doc. 84). For the reasons below, Defendants' Motion is **GRANTED**.

**BACKGROUND**

After screening Robinson's Complaint under 28 U.S.C. § 1915A, the Court allowed two Eighth Amendment claims relevant here to proceed. (Doc. 8, pgs. 5, 7, 10). Claim 1 alleges that Basler refused to change Robinson's foot dressings in March 2022. Claim 2

concerns Larson's prescription of diabetic shoes alleged to have created the initial wound, his treatment before Robinson's toe amputations, and his post surgery care. (Doc. 8, pg. 5). The remaining defendant, Debbie Isaacs, was later dismissed with prejudice by stipulation. (Doc. 65). No other claim is before the Court. As a matter of housekeeping, the Complaint initially referred to Basler as "Jennifer Bosely," but she answered indicating that she is Jennifer Basler, and is the intended defendant. (Doc. 1, pg. 30; Doc. 27, pg. 1 n.1). The Court will use her corrected name.

## I FOOTWEAR, WOUND CARE, AND OPERATIONS

Robinson has diabetes, nerve damage affecting his feet (neuropathy), foot deformities, and vascular disease. (Doc. 74-6 at 48–51). From 2019 through 2021, the records document episodes of poorly controlled blood sugar, missed and refused clinic visits, refusal of diabetes evaluation or treatment, and repeated refusals of insulin or Accu-check testing. They also document continued counseling and adjustments to Robinson's diabetes medications. (Doc. 74-6 at 1–6, 40–43; Doc. 74-5 at 17–21). Robinson testified that he did not trust doctors, did not believe he needed insulin, and thought the body could heal naturally rather than through a "bunch of pills and insulin." (Doc. 74-2, pgs. 73–75).

In September 2020, after he complained of burning feet and lower extremity swelling, Larson prescribed diabetic shoes. Robinson received size thirteen shoes in December 2020, and wore them daily for more than a year. Although Robinson ordinarily wore a size twelve, he testified that Larson periodically removed the shoes, examined his feet, and said they provided room for his toes.

Robinson acknowledged that Larson referred him to a neurologist, who prescribed a higher aspirin dose that Larson later discontinued. Robinson also testified that Larson prescribed Zoloft and explained that it was sometimes used for neuropathy. Robinson requested its discontinuation because he understood it to be an antidepressant and did not consider himself depressed. (Doc. 74-2 at 82–90). Robinson further stated that he reported prolonged foot pain to Larson, who told him that nothing could be done, other than the previously prescribed Zoloft. (Doc. 83-5 at 24 ¶ 8). He also asserted that Larson ordered no therapeutic assessment of his ability to walk after the amputations. According to Robinson, an orthopedic specialist told him that a wedge would not adequately separate his remaining toes, and he continued to experience pain and imbalance. (Doc. 83-2 at 4 ¶¶ 14–15).

In early January 2022, a nurse observed a superficial lesion on Robinson's left second toe and recorded his report that his great toe pushed the second toe up and down, causing it to rub against the shoe. (Doc. 74-6, pg. 44). When the toe became red and swollen on January 9, Larson directed an emergency department evaluation. (Doc. 74-5 at 23). The hospital diagnosed a diabetic foot ulcer and prescribed Bactrim. (Doc. 74-5 at 24, 26). The hospital ordered an x-ray, which showed no convincing evidence of deep bone infection (osteomyelitis). (Doc. 74-5 at 33). By January 19, Larson had also prescribed doxycycline. He also continued daily dressings, discovered the lack of healing and a weak or absent pulse, and initiated wound and vascular referrals. (Doc. 74-5, pgs. 35–38).

Vascular surgeon Peter Wong examined Robinson on January 24. He described a healing pressure ulcer without signs of infection, and ordered ankle-brachial-index (ABI) testing, a procedure which assesses arterial circulation by comparing blood pressure at the ankle and the arm. On January 27, wound clinician Angela Arcuri ordered daily saline cleansing and light Betadine application. (Doc. 74-5, pgs. 37–39, 53–57). Selected prison dressing notes document the use of Betadine. (Doc. 74-5 at 56–57).

At Robinson's February 8 appointment, podiatrist Jennifer Miller considered the shoes too tight and noted that they were possibly contributing to Robinson's condition, and recommended a surgical shoe. Larson approved Miller's recommendation on February 14, as reflected in the referral form and outpatient progress note. (Doc. 74-5 at 58–59. On February 22, Miller found that the ulcer on Robinson's second toe had enlarged and an ulcer had formed on Robinson's big toe. Miller could not detect pulses in Robinson's left foot and ankle and also documented neuropathy, deformities, and inadequate footwear. (Doc. 74-6 at 49–51). She removed unhealthy tissue from the wound and collected a sample for bacterial testing (PCR test). Larson later stated in a verified interrogatory answer that he approved the test. (Doc. 83-8 at 8–9, 15). She then prescribed Augmentin and ordered future iodine care and a topical antibiotic. She indicated that Robinson should keep weight off the toes, and ordered a surgical shoe. She further identified that pressure, Robinson's hammer toe deformity, his footwear and comorbidities were all potential contributors to the ulcer formation. She recorded that Robinson told her that his daily dressings had been missed "a few days," without identifying which days the dressing was missed, on how many days the dressing was

missed, or who the caregiver or caregivers were that missed the dressings. (Doc. 74-6, pgs. 48–51).

The PCR screening detected *Staphylococcus aureus* infection. (Doc. 74-6 pg. 53). On February 24, a facility nurse documented redness, swelling, tenderness, severe pain, and green or yellow drainage from the ulcers. (Doc. 74-6 pg. 60). Larson directed an emergency transfer as a result. (Doc. 74-6 pg. 60). During the resulting admission, the hospital treated cellulitis and diabetic foot infection with intravenous antibiotics. (Doc. 74-6 pgs. 61, 75) Testing also disclosed severe disease in the arteries supplying his legs, dangerously reduced blood flow, and a longstanding blockage of the main artery in his abdomen. (Doc. 74-6 at 61, 82, 120). An MRI showed no overt bone destruction, but its impression was concerning for possible early osteomyelitis. (Doc. 74-6, pgs. 83–84).

The hospital recommended transfer to Barnes-Jewish Hospital for vascular surgery. Robinson initially agreed but later expressed uncertainty. Ultimately, he declined transfer on February 28 so that he could return to the prison and consult family. (Doc. 74-6, pgs. 97, 101, 120 ; Doc. 83-12, pgs. 9–10, 20, 22, 24, 27–28, 32, 35, 38–39, 43). He changed his mind once again by March 3. That day, Miller described the wounds as guarded but locally improved. She debrided the ulcers to a bleeding base, applied a fresh iodine dressing and reapplied Robinson's surgical shoe, and directed continued daily iodine dressings and vascular planning. (Doc. 74-6, pgs. 169, 173). Wong responded to the renewed request on March 7, and Barnes admitted Robinson on March 9. (Doc. 74-6 at 175–76, 180–81, 186, 192).

On March 18, Barnes surgeons amputated Robinson's left second and third toes, and debrided the big toe's ulcer. The operation materials document the discovery of gangrene, as well as abnormal or infected bone and decreased bleeding consistent with peripheral arterial disease. On March 21, Barnes surgeons removed clot material and performed bypass surgery to restore blood flow around the blockage in Robinson's abdominal aorta. (Doc. 74-6 at 194–99, 232).

## II ALLEGATION AGAINST BASLER

Robinson supplied one detailed account involving Basler. At his deposition, he testified that, after returning from Miller's March 3 visit during a lockdown, he tried to call Basler directly because he needed foot treatment, but she left the building. He then sought a dressing change, which he relayed through correctional officer Casey. (Doc. 74-2 at 47:1–22, 50:3–13). Casey telephoned the healthcare unit and reported that Basler had responded, "He'll be all right." No one changed Robinson's dressing following that request, and he did not ask Casey again that evening. (Doc. 74-2 at 52:10–53:19).

At his deposition, Robinson also testified that Basler refused one other time, but could not date the event or say whether it occurred before or after March 3. He further testified that Basler later changed a dressing, and never refused any other treatment. He also testified that Basler was not his primary wound care nurse, and that another nurse performed most daily changes. (Doc. 74-2, pgs. 50–55). Robinson's grievance recounts similar allegations (Doc. 74-8 at 1–2, 7–8).

## III POST OPERATIVE CARE

After the operations, Robinson received wound and incision checks. (Doc. 74-6 at 237–38, 249–52). The records also document vascular and podiatry follow-up, efforts to provide custom footwear and orthotic aids, and mobility permits and equipment orders. (Doc. 74-6 at 254–59, 261, 263–67, 269–72, 281, 283, 285). The records also show that Robinson refused oral medication and Accu-Chek testing after returning to BMRCC with notes indicating that he did not "want to be bothered," and later refused a left-foot dressing change. (Doc. 74-6, pgs. 237–238, 280). At his deposition, Robinson testified that he continued to experience neuropathic pain and wanted a referral to a "proper" neurologist, while also acknowledging that Larson in fact had referred him to a neurologist. He described disagreements about the aspirin treatment the neurologist prescribed. (Doc. 74-2, pgs. 82–91).

## LEGAL STANDARDS

### I. SUMMARY JUDGMENT

The Court will grant summary judgement if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law. Fed. R. Civ. P. 56(a); *Driveline Systems, LLC v. Arctic Cat, Inc.*, 936 F.3d 576, 579 (7th Cir. 2019) (quoting *Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 853 (7th Cir. 2015), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). An assertion that a fact cannot be or is genuinely disputed must be supported by citations to particular materials in the record or by a showing that the cited materials do not establish the fact or the adverse party cannot produce admissible evidence to support it. Fed. R. Civ. P. 56(c)(1).

If the movant presents evidence showing the absence of a genuine dispute of material fact, the burden then shifts to the nonmovant to identify evidence of specific facts creating a genuine dispute for trial. *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). A dispute is genuine if the evidence would permit a reasonable jury to return a verdict for the nonmovant. *Driveline Systems*, 936 F.3d at 579. An inference resting only on speculation or conjecture is insufficient. *Skiba v. Illinois Central Railroad Co.*, 884 F.3d 708, 721 (7th Cir. 2018).

When considering the Motion, the Court does not weigh the evidence, determine credibility, or choose among competing reasonable inferences. *Johnson v. Advocate Health & Hospitals Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). The Court instead views the evidence and draws reasonable inferences in the nonmovant's (here, Robinson's) favor, asking only whether a genuine factual dispute requires trial. *Id.*

Defendants served Robinson with a detailed notice explaining Rule 56 and Local Rule 56.1. (Doc. 75). Robinson timely filed more than 400 pages in opposition, but he did not answer Defendants' proposed material facts in corresponding numbered paragraphs with specific record citations. Local Rule 56.1 requires such a response and provides that a properly supported material fact is deemed admitted unless specifically disputed. SDIL-LR 56.1(b), (f)–(g). The Court treats Defendants' proposed material facts as undisputed only to the extent they are independently supported by evidence other than the challenged affidavits and are uncontroverted by competent record evidence. And even where facts are supported and uncontroverted, the Court must determine whether the record and governing law entitle each Defendant to judgment. See *Keeton v.*

*Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012). And given Robinson's pro se status, in determining whether alleged facts are undisputed, the Court has independently reviewed the evidentiary record. The Court also considers competent contrary material elsewhere in the record, including Robinson's own sworn statements to the extent they are based on personal knowledge rather than speculation. See Fed. R. Civ. P. 56(c)(3); *Payne v. Pauley*, 337 F.3d 767, 772–73 (7th Cir. 2003) (holding that a nonmovant's self-serving testimony or affidavit is competent evidence sufficient to defeat summary judgment where grounded in personal knowledge and firsthand experience).

## II. Deliberate Indifference to a Serious Medical Need

Prison medical personnel violate the Eighth Amendment when they act with deliberate indifference to an incarcerated person's serious medical need. *Jones v. Mathews*, 2 F.4th 607, 612 (7th Cir. 2021); *Lewis v. McLean*, 864 F.3d 556, 562 (7th Cir. 2017). A plaintiff must establish both an objectively serious medical condition and the defendant's deliberate indifference to the plaintiff's health or safety. *Jones*, 2 F.4th at 612; *Orlowski v. Milwaukee County*, 872 F.3d 417, 422–23 (7th Cir. 2017). The Court considers the inmate's medical care as a whole. *Lisle v. Welborn*, 933 F.3d 705, 716 (7th Cir. 2019).

The subjective component requires evidence that the defendant knew facts from which a substantial risk of serious harm could be inferred, actually drew that inference, and intentionally or recklessly disregarded the risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Jones*, 2 F.4th at 612–13. Knowledge may be established through circumstantial evidence, including evidence that the risk was obvious. *Farmer*, 511 U.S. at 842. Negligence, medical malpractice, an inadvertent failure to provide adequate care, and a

mere disagreement with medical judgment are not deliberate indifference. *Estelle v. Gamble*, 429 U.S. 97, 105–07 (1976); *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

Courts defer to a medical professional's treatment decision unless no minimally competent professional would have responded in the same way under the circumstances. *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019); *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008). A reasonable response is not unconstitutional merely because it fails to avert harm. *Orlowski*, 872 F.3d at 424. Medical treatment may support a deliberate-indifference claim only if it is such a substantial departure from accepted professional judgment, practice, or standards that it demonstrates the absence of professional judgment. *Campbell*, 936 F.3d at 545; *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). The fact that an inmate received some treatment is not conclusive if the treatment was blatantly inappropriate. *Roe*, 631 F.3d at 858.

The Eighth Amendment does not entitle an inmate to demand a particular medication, diagnostic test, referral, or preferred course of treatment. See *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011); *Pyles*, 771 F.3d at 411. A factfinder may infer deliberate indifference when a professional persists in a course known to be ineffective, ignores specialist instructions, chooses an easier and less efficacious treatment without exercising judgment, or inexplicably delays necessary treatment. *Petties v. Carter*, 836 F.3d 722, 729–31 (7th Cir. 2016) (en banc).

When the deliberate indifference claim rests on a delay theory, its significance depends on the seriousness of the condition, the defendant's knowledge, the ease of treatment, the reason for the delay, and the resulting harm. See *Arnett*, 658 F.3d at 753;

*McGowan v. Hulick*, 612 F.3d 636, 640–41 (7th Cir. 2010). The plaintiff must offer competent evidence permitting a jury to attribute exacerbation, prolonged pain, or other harm to the delay rather than merely to the underlying condition. *Thomas v. Martija*, 991 F.3d 763, 771 (7th Cir. 2021); *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013); *Williams v. Liefer*, 491 F.3d 710, 714–16 (7th Cir. 2007); see also *Barnes v. Wexford Health Sources, Inc.*, 177 F.4th 825, 833–34 (7th Cir. 2026). This evidence need not invariably be expert testimony, but it must, in some way, connect the delay itself to the claimed harm. See *Jackson v. Sheriff of Winnebago County*, 74 F.4th 496, 500–04 (7th Cir. 2023). A defendant is not liable for delay he did not cause or control. *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 966 (7th Cir. 2019).

The parties do not meaningfully dispute that Robinson's infected and ischemic ulcers presented an objectively serious medical need. The remaining questions, then, concern each Defendant's knowledge, response, and responsibility for the harm Robinson attributes to the challenged conduct.

## Analysis

### I. Preliminary Matters

Defendants ask the Court to exclude Robinson's exhibits because his opposition exceeded 150 pages. (Doc. 84, pgs. 1–2). The March 12 Order, however, granted Robinson additional time to mail his 400-plus-page filing. It mentioned the 150-page electronic-filing limit only as a fallback if Robinson could not timely mail the filing. (Doc. 82). Out of an interest for fairness, the Court declines to exclude the timely mailed exhibits.

Robinson, in turn, objects that Larson's and Basler's affidavits were not properly sworn. (Doc. 83-3, pgs. 6–8). The disposition below does not depend on either affidavit. The Court instead relies on Robinson's deposition and the sworn submissions, contemporaneous medical records, and Larson's interrogatory answers among Robinson's exhibits. The Court therefore need not decide the execution objection.

## II. Claim 1 – Basler

The Court assumes that Casey called the healthcare unit on March 3, Basler responded, "He'll be all right," and no one changed Robinson's dressing after the request. Even on Robinson's preferred version of the facts, the claim fails because the evidence does not show that Basler knew another dressing change was then necessary.

Miller had debrided the wounds and applied a fresh iodine dressing earlier that day. Her written instructions called for continued daily dressing changes. (Doc. 74-6 at 173). Robinson does not identify evidence that another change was ordered that evening. He does not attest that the otherwise fresh dressing was missing, displaced, saturated, or contaminated. And he does not say that he reported any condition that could give rise to a reasonable basis for Basler to conclude a second dressing was needed that day. Even if he told officer Casey some specific condition, the record does not identify what Casey told Basler about the wound, the dressing, or any urgency beyond the request for a change. Even assuming Basler heard Robinson's direct request for foot treatment, his testimony does not describe communicating a problem with the existing dressing or another condition requiring an additional change, either directly or through Casey. (Doc. 74-2 at 50:3–13, 52–53). Thus, Basler's alleged response supports at most an inference that

she declined a request. It does not support an inference that she actually recognized and disregarded a substantial risk that might arise from leaving that day's fresh dressing in place.

The other alleged refusal does not supply the missing facts. Robinson could not date it, and his account of this second missed change does not describe the old dressing's condition, the length of time since the last change, or what symptoms or conditions Robinson communicated to Basler. (Doc. 74-2 at 50–55). Miller also recorded Robinson's report that daily dressing care had been missed "a few days," but that report did not identify the responsible provider or what Basler knew about any lapse. (Doc. 74-6 at 48). Those accounts do not establish that Basler knowingly left a substantial medical risk unaddressed. The additional factual propositions Robinson seeks to establish through requests for admission are considered separately below.

Robinson also contends that requests for admission relevant to his claim against Basler went unanswered. For a properly served request, failure to serve a signed written answer or objection within the applicable response period results in an admission. An admission binds the party unless, on motion, the Court authorizes its withdrawal or amendment. Fed. R. Civ. P. 36(a)(3), (b); *Kalis v. Colgate-Palmolive Co.*, 231 F.3d 1049, 1059 (7th Cir. 2000). The Court assumes for purposes of the Motion that Requests 1, 7, and 10 are binding admissions. Request 1 establishes noncompliance with ordered dressing care on February 23 and March 23. Request 7 establishes a failure to assist with Robinson's ordered daily dressing changes before the identified infection and subsequent

complications. Request 10 establishes that Basler nevertheless applied Bacitracin and a wrap on the two specified dates. (Doc. 83-8 at 47–49).

Even accepting those failures, however, the admissions do not establish deliberate indifference. Request 1 does not identify the particular departure from the dressing instructions, and Request 7 does not establish the duration or circumstances of any interruption in care attributable to Basler. Neither supplies circumstances showing that she recognized a substantial risk from the care she provided or omitted. Robinson's remaining evidence does not fill that gap. His detailed account concerns a request made after Miller had already dressed the wound that day, while his other account does not describe the wound's condition, the interval since its last dressing, or information communicating an unmet medical need to Basler. (Doc. 74-2 at 50–55; Doc. 74-6 at 173). The later diagnoses establish the seriousness of Robinson's condition, but do not themselves establish Basler's state of mind during an earlier lapse.

Taken together, this evidence permits a finding of noncompliance with ordered care, but not a reasonable finding that Basler consciously disregarded a substantial risk. See *Farmer*, 511 U.S. at 837; *Estelle*, 429 U.S. at 105–06. Because the claim fails even when assuming the admissions are binding, the Court need not resolve the disputes concerning service, response deadlines, or withdrawal.

No reasonable jury could find the required knowledge and conscious disregard on this record. Therefore, Basler is entitled to summary judgment on Claim 1.

## III. CLAIM 2 – LARSON

Claim 2 encompasses three theories. First, that Larson prescribed shoes that created the wound. Second, that he mishandled the wound before amputation. And third, that he provided deficient post operation care. The question under each theory is whether the evidence permits a reasonable finding that Larson knowingly disregarded a substantial risk to Robinson's health.

A. **FOOTWEAR**

Robinson states that Larson knew he ordinarily wore a size twelve narrow shoe but insisted on prescribing size thirteen. (Doc. 83-5 at 23 ¶ 6). Accepting that account, knowledge of Robinson's customary shoe size does not itself establish knowledge that the prescribed diabetic footwear posed a substantial risk. Robinson also testified that Larson examined his feet and explained that the shoes provided room for his toes; he acknowledged that he did not report a fit problem or request replacement shoes. (Doc. 74-2 at 26:19–27:3, 28–30, 33:18–34:10, 35:15–21). Those facts describe an assessment of the footwear's suitability, even if that assessment ultimately may have proven mistaken. The later wound and Miller's subsequent assessment may support a connection between the footwear and injury, but they do not establish that Larson appreciated that risk when he originally prescribed the shoes. The evidence therefore does not permit a reasonable finding that Larson consciously disregarded a substantial risk when he initially prescribed the diabetic shoes.

Robinson's belated factual allegations do not disturb this result. Larson approved Miller's surgical-shoe recommendation on February 14. (Doc. 74-5 at 58). Robinson, in his opposition to Larson's Motion for Summary Judgement, asserts that Larson compelled

continued use of the diabetic shoes after Miller recommended a surgical shoe. (Doc. 83-2 at 3 ¶ 6). The Complaint challenges Larson's initial prescription of diabetic shoes and his treatment of Robinson's wounds. Even read broadly, it does not allege that Larson required Robinson to keep wearing those shoes after Miller recommended a surgical shoe. (Doc. 1 at 21 ¶ 53, 27–28). Robinson first raised this new factual basis for his claim against Larson after discovery closed and defendants moved for summary judgment, even though the alleged conduct was within his knowledge from the outset. Given the unexplained delay and potential prejudice that would arise from introducing a previously unpleaded instruction requiring further factual investigation, the Court declines to permit that expansion of this claim. See *Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 488–90 (7th Cir. 2023); *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 859–60 (7th Cir. 2017) (holding that when a summary judgment response alters the factual basis of a claim, the court has discretion to deny the de facto amendment if it causes unfair surprise or prejudice). The belated compulsion theory therefore provides no basis to deny summary judgment on the pleaded footwear claim.

### B. Pre Amputation Care

Robinson next contends that Larson persisted in prescribing Bacitracin instead of Betadine, obtained culture information too late, failed to ensure daily dressings, delayed vascular or hospital care, and thereby allowed infection and gangrene to progress. The wound indisputably worsened. The question is whether the record permits a factfinder to attribute that progression to Larson's knowing disregard. It does not.

Robinson's testimony also places Larson's knowledge of the wound at least a couple of months before January 9, 2022, when Larson was treating it with antifungal cream. (Doc. 74-2 at 30:14–22). The Court accepts that earlier notice. That account establishes Larson's knowledge of the lesion and his decision to treat it with antifungal cream. It does not, however, identify circumstances showing that Larson recognized the cream as ineffective during that earlier period. The wound's later progression does not, by itself, establish that the earlier treatment decision reflected conscious disregard rather than an incorrect assessment. See *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662–64 (7th Cir. 2016). Thus, the earlier-knowledge testimony does not supply the missing evidence that Larson knowingly persisted in inadequate treatment before January.

First, the contemporaneous treatment record does not show persistence in known ineffective care. Larson ordered daily dressings and sent Robinson to the emergency department when redness and swelling appeared. When the wound did not heal promptly, he added antibiotics, identified a weak pulse, and initiated wound, podiatry, and vascular referrals. (Doc. 74-5 at 23–24, 33–39, 53–59). Wong evaluated Robinson on January 24, and Arcuri evaluated him on January 27. Arcuri's Betadine order was implemented in selected records, and Miller later ordered iodine care together with a topical antibiotic. Miller obtained the February 22 PCR, and Larson's verified interrogatory answer states that he personally approved it. (Doc. 83-8 at 8–9, 15). Robinson also challenges the timing of that test. The intervening record, however, documents antibiotic treatment and specialist referrals, and identifies no earlier testing

recommendation that Larson rejected or other circumstances showing that he recognized the absence of a wound test as a substantial risk. The test's later usefulness does not itself establish that Larson knowingly delayed necessary diagnostic care. See *Pyles*, 771 F.3d at 411. When marked redness, swelling, tenderness, and drainage appeared on February 24, Larson was the one who directed emergency transfer. (Doc. 74-5, pgs. 23–39, 53–59; Doc. 74-6, pgs. 48–60; Doc. 83-8, pgs. 8–9). That sequence does not show that Larson knowingly continued a course of treatment he knew was failing.

Second, the evidence does not permit a finding that Larson knowingly caused an unjustified delay in dressing, vascular, or hospital care. Miller recorded Robinson's report of missed dressing changes, but did not identify Larson (or any particular provider) as responsible for those omissions. (Doc. 74-6 at 48). Larson's recognition of a weak pulse led to a vascular referral, and Wong evaluated Robinson and ordered ABI testing. (Doc. 74-5 at 35–39). The absence of an outpatient test result does not, without more, establish that Larson prevented the testing or knowingly ignored an obstacle requiring his intervention. The hospital-transfer chronology likewise does not identify an unjustified delay attributable to Larson: Robinson declined transfer on February 28, expressed renewed agreement on March 3, returned to Wong on March 7, and entered Barnes on March 9. (Doc. 74-6 at 97, 101, 120, 169, 175–76, 180–81, 186, 192). The elapsed time alone does not identify a decision or omission by Larson that caused an unconstitutional delay. See Walker, 940 F.3d at 966.

The Court need not determine whether different care would have prevented further injury or the amputations. Even accepting Robinson's earlier wound testimony

and the documented deterioration, the evidence does not permit a reasonable finding that Larson knowingly maintained inadequate treatment or caused an unjustified delay in necessary care. Larson is therefore entitled to summary judgment on the pleaded pre-amputation theories.

**POST OPERATIVE CARE**

In his affidavit, Robinson states that he reported prolonged foot pain to Larson, who told him that nothing could be done. But that same affidavit acknowledges Larson's offer of Zoloft, and Robinson's deposition describes both a neurology referral and Larson's explanation that the medication was intended to treat neuropathy. Robinson requested its discontinuation because he understood it to be an antidepressant and did not consider himself depressed. (Doc. 83-5 at 24 ¶ 8; Doc. 74-2 at 86–88). His account therefore establishes that Larson knew about the pain, but also identifies a response directed to that pain. Robinson's objection to the medication's classification does not establish that prescribing it for neuropathy departed from professional judgment. Nor does continued pain, without evidence that Larson knowingly provided inadequate treatment, establish deliberate indifference. See *Arce v. Wexford Health Sources, Inc.*, 75 F.4th 673, 681 (7th Cir. 2023).

Robinson also testified that Larson discontinued the higher aspirin dose prescribed by the neurologist. He attributed that decision to Larson's apparent displeasure with the prescription, but identified no statement explaining a nonmedical reason for the change. He also expressly declined to assert that the higher dose would have effectively managed his pain. (Doc. 74-2 at 89–90). The difference between the

physicians' prescriptions, and Larson's facial expression upon learning of the higher dose, do not establish that Larson knowingly disregarded a substantial risk. The record does not otherwise connect that change to an injury. Likewise, although Robinson wanted a different, "proper" neurologist, he acknowledged receiving a neurology consultation and identified no particular deficiency in that specialist's evaluation that Larson knowingly left unaddressed. (Doc. 74-2 at 87–91). These disagreements do not permit a finding that Larson abandoned professional judgment. See *Pyles*, 771 F.3d at 409–11.

Robinson's allegation that Larson failed to order a therapeutic assessment of his walking requires separate consideration. The Court accepts his account of continuing pain and imbalance and does not equate orthotic treatment with a formal walking assessment. (Doc. 83-2 at 4 ¶¶ 14–15). The records nevertheless document evaluation for custom shoes and inserts, subsequent footwear adjustments, and Larson's orders for crutches and a wheelchair for distance travel. (Doc. 74-6 at 256–59, 263–67, 283, 285). Even accepting the reported specialist's statement that a wedge would not adequately separate his remaining toes, that statement does not establish that therapeutic walking assessment was recommended or that Larson knew the prescribed measures left a substantial risk unaddressed. Neither the testimony nor the treatment records establish that the need for that additional assessment was so apparent that its omission permits an inference of conscious disregard. Robinson's continuing limitations therefore do not, on this record, establish constitutionally deficient postoperative care. Larson is entitled to summary judgment on these theories.

As such, Larson is entitled to summary judgment on each of the footwear, pre amputation, and post-surgical components of Claim 2.

## Disposition

Defendants' Motion for Summary Judgment (Doc. 73) is **GRANTED**. Basler is entitled to judgment on Claim 1, and Larson is entitled to judgment on every component of Claim 2. No claims remain.

The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendants Jennifer Basler and Dennis Larson and against Plaintiff Eddie Robinson and then to **CLOSE** this case.

**SO ORDERED.**

Dated: September 21, 2026

Judge Dugan

Digitally signed by Judge Dugan
Date: 2026.09.21 10:19:26 -05'00'

DAVID W. DUGAN
United States District Judge